UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | |
| CDC CORPORATION, | : | CASE NO. 11-79079 |
| | : | |
| Debtor. | : | JUDGE BONAPFEL |

---------------------------------------------------------------------------------------------------

| | | |
|---|---|---|
| | : | |
| CDC LIQUIDATION TRUST, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adversary Proceeding |
| | : | No. |
| AIG EUROPE LIMITED, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

## **COMPLAINT**

COMES NOW CDC Liquidation Trust and files this and respectfully shows as follows:

## **JURISDICTION AND VENUE**

1.     The Court has jurisdiction to adjudicate this matter pursuant to 28 U.S.C. § 1334. This adversary proceeding is properly before the Court under 28 U.S.C. § 157, and is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E) and (O).

2.     Venue properly lies in this Court.

3.     By Order entered September 6, 2012 (the "Confirmation Order"; Docket No. 551), the Court confirmed the Second Amended Joint Plan of Reorganization for CDC Corporation dated August 29, 2012, as modified by the Confirmation Order (the "Plan"), which was proposed by the Debtor and the Official Committee of Equity Security Holders of CDC Corporation (the "Equity Committee").

4.      Paragraph TT of the Confirmation Order provides: "Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction as provided in the Plan over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law[.]"

5.      On December 19, 2012, the Plan became effective (the "Effective Date").  Under the Plan, the CDC Liquidation Trust was established on the Effective Date, and Mr. Marcus Watson became the Liquidation Trustee.

6.      Under the Plan, all of the Debtor's assets and all property of the estate, including estate causes of action, were transferred to the CDC Liquidation Trust.  See Plan § 7.10.  The Liquidation Trustee has the authority to commence, prosecute and litigate causes of action.  See Plan § 7.11.

## DEFENDANT

7.      Defendant AIG Europe Limited, f/k/a Chartis Europe Limited, f/k/a Chartis Insurance UK Limited ("AIG") is a subsidiary of American International Group, Inc. and is a company registered in England with a principal place of business located at The AIG Building, 58 Fenchurch Street, London EC3M 4AB, United Kingdom.

## BACKGROUND FACTS

### CDC's Bankruptcy and the Underlying Litigation

8.      CDC Corporation (the "Debtor" or "CDC") filed its Chapter 11 petition on October 4, 2011 (the "Petition Date").

9.      During the course of the Debtor's Chapter 11 case, the Debtor settled certain disputed claims asserted by Evolution CDC SPV Ltd. and certain of its affiliated entities (the

408205.docx

"Evolution Parties") for over $70,000,000. However, the Evolution Parties were unwilling to issue general releases to the Debtor and its former officers, directors, and affiliates. The settlement between the Debtor and the Evolution Parties was approved by this Court in an order entered on April 11, 2012 (Docket No. 311).

10.    On or about April 27, 2012, the Evolution Parties, along with Evolution Capital Management, LLC ("ECM") commenced an action in the Supreme Court of the State of New York, New York County, styled: *Evolution Capital Management, LLC, Evolution CDC SPV Ltd., Global Opportunities Fund Ltd., SPV, Segregated Portfolio M (f.k.a. "Evolution Master Fund Ltd., SPC, Segregated Portfolio M"), Evo China Fund and El Fund Ltd., Plaintiffs, against CDC Software Corporation, Wong Chung Kiu (a.k.a. "C.K. Wong"), Yip Hak Yung (a.k.a. "Peter Yip"), Asia Pacific Online Limited (a.k.a. "Asia Pacific On-line Limited"), Ch'ien Kuo Fung (a.k.a. "Raymond Ch'ien"), Francis Kwok-Yu Au, Donald L. Novajosky, Monish Bahl, Thomas M. Britt III, Wong Kwong Chi (a.k.a. "Simon Wong"), and Wang Cheung Yue (a.k.a. "Fred Wang"), Defendants*; Index No. 651395/2012 ( the "Evolution Action").

11.    The Evolution Action was brought against certain of the Debtor's former employees, officers, and directors ("D&O Defendants"), as well as CDC Software Corporation and Asia Pacific Online Limited. In sum, ECM and the Evolution Parties sought to recover damages allegedly resulting from the Defendants' alleged tortious interference with prospective business relations, breach of fiduciary duty, malicious prosecution, and libel *per se*.

12.    The D&O Defendants retained counsel to represent them in the Evolution Action.

13.    With the single exception of Francis Kwok-Yu Au, each of the D&O Defendants made formal demand on the Debtor and filed claims in this Court for indemnification or reimbursement from the Debtor for their losses arising out of the Evolution Action. Francis

408205.docx

3

Kwok-Yu Au made demand upon the Debtor for indemnification without filing any formal claim or pleading in the Bankruptcy Court.  CDC Software Corporation, Donald Novajosky, Asia Pacific Online Limited, Peter Yip, Monish Bahl, Thomas M. Britt, III, Raymond Ch'ien, Wong Chung Kiu, Fred Wang, and Simon Wong filed claims in the Debtor's Chapter 11 case and asserted that the Debtor was responsible for defending and indemnifying them against the claims asserted in the Evolution Action.

14.     The Debtor disputed that it had any indemnification obligations to Wong Chung Kiu, CDC Software Corporation or Asia Pacific Online Limited.  However, consistent with and subject to Cayman Islands law, the articles of association of the Debtor, and/or certain deeds of indemnity, the Debtor acknowledged that it had certain indemnity obligations to each of the D&O Defendants in the Evolution Action, except that it denied any indemnity obligation to Wong Chung Kiu or to Francis Kwok-Yu Au, who served as a director of CDC Software Corporation.

15.     At all times relevant to the allegations set forth herein, the various counsel for the D&O Defendants endeavored to coordinate their respective efforts so that the professional fees and expenses incurred in connection with the Evolution Action were reasonable under the circumstances.

16.     The Debtor advanced any and all defense costs in connection with the Evolution Action on behalf of the D&O Defendants.

**The Debtor Purchased Directors  and Officers Liability Insurance**

17.     In effect at all relevant times was AIG Policy No. SPRDW1000311 issued to CDC Corporation (the "Policy"), providing primary Directors and Officers Liability Insurance

408205.docx

with effective dates of coverage between December 15, 2010 and March 15, 2013.[1]  It is a wasting limits policy such that defense costs erode the policy limits.  The Policy carries an aggregate limit of liability of $10 million and a sub-limit of $6 million payable in addition to the aggregate limit.  All applicable premiums were paid.

18.    Section 1.1 of the Policy provides $10 million in Management Liability coverage which contains two applicable insuring agreements.

19.    Pursuant to Section 1.1(i) of the Policy entitled "Individuals," AIG promises to "pay the *loss* of each *insured person* except to the extent that the *insured person* has been indemnified by the *company* for such *loss*."

20.    Pursuant to Section 1.1(iii) of the Policy entitled "Company Reimbursement," AIG also promises to "reimburse or pay on behalf of a *company* any *loss* for which it has indemnified an *insured person*."

Italicized words or phrases are defined policy terms, as follows[2]:

21.    *Insured person*, either in the singular or the plural, includes "any natural person who was, is or during the *policy period* becomes . . . a *director* or *officer*, but not an external auditor or insolvency office-holder of a *company*."  A *director* or *officer* is "any natural person director or officer of a *company*."

22.    The *company* includes the *policyholder*, which is designated in Item 1 of the Schedule as CDC Corporation.  *Company* also includes any *subsidiary*, which is "any entity which the *policyholder controls* either directly or indirectly through one or more other entities on

---

[1] The policy period was extended from its original expiration date of December 15, 2011 through March 15, 2013 in exchange for an additional payment of premium.  A copy of the Policy is attached hereto as Exhibit "A."
[2] Italicized words or phrases herein are intended to have the same meaning as defined in the Policy.

or before the inception date of" the Policy.  The Policy accordingly provides primary liability insurance for the directors and officers of CDC Corporation and CDC Software Corporation.

23.     *Loss* is defined, in relevant part, as "any amount which the *insured* is legally liable to pay resulting from a *claim* against an *insured* including *crisis loss*, *defence* [sic] *costs*, *investigation costs*, awards of damages (including aggravated, punitive and exemplary damages), awards of costs or settlements (including claimant's legal costs and expenses), pre and post-judgment interest on a covered judgment or award, fines and penalties and the multiplied portion of multiple damages.  *Defence costs* include, in relevant part, those "reasonable fees, costs and expenses, incurred with the *insurer's* prior written consent, by or on behalf of an *insured* after a *claim* is made, directly in connection with its investigation, defence, settlement or appeal."

24.     A *claim* includes "a written demand made or brought against an *insured person* alleging a *wrongful act*."

25.     A *wrongful act*, with respect to any *insured person*, is "any actual or alleged act, error or omission by an *insured person* in any of the capacities listed in the definition of *insured person*; or any matter claimed against an *insured person* solely because of such listed capacity."

26.     AIG has agreed to pay the *loss* of each *insured person*, and to reimburse or pay on behalf of a *company* any *loss* for which it has indemnified an *insured person*, in connection with any *claim* first made against an *insured person* between December 15, 2010 and March 15, 2013, regardless of whether the *wrongful acts* occurred before or after the Policy's inception.

27.     The Policy accordingly covers any *claim* first made against CDC Corporation and CDC Software's insured *directors* and *officers* between December 15, 2010 and March 15, 2013 for *wrongful acts* whether committed before or after the Policy's inception.  It further covers any *loss* paid by CDC Corporation in order to indemnify those *directors* and *officers*.

408205.docx

28.     In addition to the Management Liability coverage, Section 1.2 of the Policy provides an additional $6 million in "Special Protection for Non-Executive Directors."

29.     Under the insuring agreement, AIG promises to pay "the *non-indemnifiable loss* of each and every *non-executive director*, up to the *per non-executive director special excess limit*, when: (i) the *limit of liability*; (ii) all other applicable management liability insurance, whether specifically written as excess over the *limit of liability* of this policy or otherwise; and (iii) all other indemnification for *loss* available to any *non-executive director*, have been exhausted.  The *insurer's* liability under this Insurance Cover 1.2 for all *non-executive directors* is subject to the *non-executive director special excess aggregate limit*."

Previously-defined italicized words or phrases have the same meaning as above. Additional italicized words or phrases are defined policy terms, as follows:

30.     A *non-executive director* is "any natural person who at the inception of the *policy period* serves, or during the policy period begins serving as a director of the *company* and who is not an employee of the *company*."

31.     *Non-indemnifiable loss* includes the "*loss* of an *insured person* that a *company* is unable to indemnify due to legislative prohibition or *insolvency*."  *Insolvency* is defined as "the inability of a company to pay its debts as they fall due, as determined in accordance with Section 123 of the Insolvency Act 1986."[3]

32.     The *limit of liability* is the amount referred to in Item 4 of the Schedule, which is $10,000,000.

33.     The *non-executive director special excess aggregate limit* is the sum specified in Item 5(b) of the Schedule "being the aggregate limit for all *non-executive directors*."  Item 5(b)

---

[3] Pursuant to Section 5.18 of the Policy, "all references to specific legislation are English legislation."

408205.docx

of the Schedule indicates there is an aggregate limit for all *non-executive directors* of $6,000,000.

34.     AIG has agreed to pay the *non-indemnifiable loss* of each *non-executive director* in connection with any *claim* first made between December 15, 2010 and March 15, 2013, regardless of whether the *wrongful acts* occurred before or after the Policy's inception.

35.     The Policy accordingly covers any *claim* first made against CDC Corporation and CDC Software's *non-executive directors* between December 15, 2010 and March 15, 2013 for *wrongful acts* whether committed before or after the Policy's inception.

36.     In accordance with all relevant Policy provisions, the Debtor timely provided a Notice of Claim to AIG regarding the Evolution Action on July 24, 2012.

37.     By letter dated July 31, 2012, AIG made an extensive document request in order to evaluate the claims at issue and provide a coverage position.  Notwithstanding the questionable relevance and unreasonable volume of documents sought, the Debtor promptly complied and provided all responsive documents on September 7, 2012.

38.     Having received no response from AIG, the Debtor wrote on October 4, 2012 to request a coverage position no later than October 25, 2012 – a full forty-five days from the date the insurer received the requested documents.  This date came and passed without a coverage position.

39.     By letter dated November 13, 2012, the Debtor advised that AIG's failure to act had caused CDC's estate to incur unnecessary administrative costs and otherwise hindered its ability to make distribution to creditors.  Specifically, the estate had been required to reserve in excess of $42 million in connection with the Evolution Action even though the subject claims and related defense costs were covered by the Policy.  The Debtor accordingly demanded that

408205.docx

AIG advance defense costs by November 30, 2012 or justify its failure to do so by express reference to the Policy and applicable law.  Once again, this deadline came and passed with silence from the insurer.

40.    On November 29, 2012, the Debtor again wrote AIG to advise that the plaintiffs in the Evolution Action had made a settlement offer of $7.8 million, which would secure a global release on behalf of the D&O Defendants.  That offer constituted a reasonable settlement under the circumstances, as the cost of defense alone would easily surpass this amount should the suit be litigated to trial and verdict.  The Debtor had already advanced more than $1 million in connection with the *insured persons*' defense, and the Evolution Action sought a recovery in excess of $15 million, plus additional unliquidated damages.  In the interest of consummating a resolution, CDC invited the carrier's immediate participation in any and all settlement negotiations with the Evolution Parties.

41.    AIG promptly declined this invitation.  By correspondence dated December 7, 2012, the insurer indicated it was premature to take any part in settlement negotiations – despite having been placed on notice of the claim more than four (4) months prior.  Rather than participate, AIG indicated it had no objection to the proposed settlement and waived any future defense predicated on the insureds' failure to obtain consent to settle pursuant to Section 5.9 of the Policy.

42.    As a result of the negotiations with the Evolution Parties, the Debtor and the Equity Committee were able to negotiate a reasonable settlement of all claims asserted in the Evolution Action that provided for a complete release of any and all claims that the Evolution Parties, ECM, or their affiliates had against the Debtor, the D&O Defendants, CDC Software

408205.docx

Corporation and Asia Pacific Online Limited in exchange for payment of $7.8 million to the Evolution Parties and ECM (the "Evolution Settlement").

43.    In a motion filed in this Court on December 12, 2012, the Debtor and Equity Committee sought approval of the Evolution Settlement.  By Order entered December 19, 2012 (Docket No. 671), the Court granted the motion.

44.    CDC Software Corporation contributed $400,000.00 to the payment required under the Evolution Settlement, with the balance – $7.4 million – paid by the Debtor.  While this payment was made by the Debtor in resolution of all claims that the Evolution Parties and ECM had against the Debtor and the D&O Defendants, the practical reality was (and is) that the payment was made to resolve claims asserted in the Evolution Action that were subject to indemnities from the Debtor to the D&O Defendants (except for Wong Chung Kiu and Francis Kwok-Yu Au, who are directly insured under the terms of the subject Policy).

45.    In connection with the Evolution Action, the Debtor advanced a total of $1,545,852.32 for the reasonable defense fees, costs, and expenses on behalf of the D&O Defendants.

**AIG's Continued Refusal to Reimburse the Debtor for Defense Costs
and the Evolution Settlement**

46.    By letter dated January 22, 2013, CDC demanded reimbursement, in excess of the applicable Policy retention, for, *inter alia*: (i) the amount expended to consummate the Evolution Settlement, and (ii) the $1,545,852.32 expended in reasonable fees, costs, and expenses in connection with the *insured persons*' defense.

47.    By letter dated February 15, 2013, AIG provided its first substantive correspondence addressing the Debtor's claim for indemnity under the Policy.  That letter simply

408205.docx

raised a host of factual inquiries and requested additional information from the Debtor.  AIG reiterated its intention to "pay what is appropriate under the Policy," and suggested a telephone conference to discuss its position further upon receipt of this information.

48.     The Debtor responded in detail to this request by letter dated March 22, 2013 and provided all known factual information and documentation responsive to AIG's inquiries.  CDC welcomed AIG's call to discuss the parties' positions upon receipt and review of the materials provided.

49.     Instead, in an effort to engender further delay in making payment under the Policy, AIG's letter of May 7, 2013 requested yet additional information on subjects that had already been addressed to the best of the Debtor's knowledge.  The insurer further reiterated its "intention to pay what is appropriate under the Policy" but purportedly required further information "in order to assess its appropriate level of contribution."  After more than nine (9) months, the insurer expressed its belief that scheduling a call or meeting between the parties would be "premature at this time."

50.     Despite more than ample time and information to investigate the claim at issue and render payment in accordance with the Policy, AIG has failed to reimburse the Debtor for the Evolution Settlement or defense costs in connection with the Evolution Action or provide any cogent explanation for its failure to do so.

51.     AIG, by its refusal to indemnify CDC for covered *loss*, has breached its obligations under the Policy to reimburse the Debtor in excess of the applicable retention for (i) the $7.4 million paid to resolve the Evolution Action, and (ii) the $1,545,852.32 expended in reasonable fees, costs, and expenses in connection with the *insured persons*' defense.

408205.docx

<u>**Compliance with All Conditions Precedent**</u>

52.     All conditions precedent to the bringing of this action have been satisfied. Alternatively, compliance with any conditions precedent has been excused or waived.

<u>**Retention of Counsel**</u>

53.     The Debtor has retained the law firms of Lamberth, Cifelli, Stokes, Ellis & Nason, P.A. and Ver Ploeg & Lumpkin, P.A. and their attorneys to represent it in this action and has agreed to pay them reasonable attorneys' fees, plus all expenses incurred, for their services.

<u>**COUNT I – BREACH OF CONTRACT**</u>

54.     The allegations contained in paragraphs 1 through 53 are incorporated herein as if fully restated in their entirety.

55.     AIG, through the acts of its agents, representatives, and/or employees, failed to perform its duties and/or obligations under the Policy and thus breached the contract by its acts or omissions as alleged herein by, including without limitation, its failure and refusal to reimburse the Debtor for: (i) the $7.4 million paid to resolve the Evolution Action on behalf of the D&O Defendants, and (ii) the $1,545,852.32 expended in reasonable fees, costs, and expenses in connection with the D&O Defendants' defense.

56.     As a direct, proximate, and natural result of AIG's breach(es), the Debtor suffered foreseeable damage, as it has been deprived of the benefits due under the Policy.

57.     AIG is accordingly liable to the Debtor for payment of (i) the $7.4 million paid to resolve the Evolution Action on behalf of the D&O Defendants, and (ii) the $1,545,852.32 expended in reasonable fees, costs, and expenses in connection with the D&O Defendants' defense in the Evolution Action.

408205.docx

58.     CDC Liquidation Trust, as successor-in-interest to the Debtor, is entitled to recover damages from the Defendant resulting from these breaches of the Policy.

WHEREFORE, CDC Liquidation Trust requests that this Court:

(i)  enter a judgment against Defendant awarding the CDC Liquidation Trust damages as follows: (1) reimbursement of the $7.4 million  paid by the Debtor in connection with the Evolution Settlement; *plus* (2) reimbursement of the $1,545,852.32 in fees, costs, and expenses paid to counsel for the D&O Defendants less the applicable self-insured retention *plus* (3) pre-judgment and post-judgment interest as appropriate; and

(ii)  grant such further and other relief as the Court deems proper.

## COUNT II – SPECIFIC PERFORMANCE OF POLICY'S ALLOCATION PROVISION

59.     The allegations contained in paragraphs 1 through 53 are incorporated herein as if fully restated in their entirety.

60.     In the alternative to Count I for Breach of Contract, AIG has suggested that there is a dispute between the Debtor and the Defendant regarding a proper allocation of the Policy proceeds to reimburse the Debtor in connection with the Evolution Settlement and Evolution Action.

61.     In relevant part, Section 5.10 of the Policy provides as follows:

5.10 Allocation

The insurer shall be liable only for *defence costs* or other *loss* derived exclusively from a covered *claim* against an *insured person* or a covered *securities claim* against a *company*.

If either:

(i) a *claim* (other than a *securities claim*) is made jointly against:

a) any *insured person*; and

408205.docx

13

b) any *company* or any other person or entity; or

(ii) a *claim* involves both covered and uncovered matters or persons under this policy,

then the *insured* and the *insurer* shall use commercially reasonable efforts to determine a fair and proper allocation of *loss* covered under this policy, on the basis of established judicial allocation principles which take into account the legal and financial exposures, and the relative benefits obtained by the relevant parties.

If the *insurer* and the *insured* cannot agree on allocation in accordance with this general provision within 14 days, then the *insured* may refer the determination to a *senior counsel*, whose decision shall be final and binding on all parties. The *senior counsel* is to determine the fair and equitable allocation as an expert, not as an arbitrator. The *insured* and the *insurer* shall be entitled to make written submissions to *senior counsel*. The *senior counsel* is to take account of the parties' submissions, but the *senior counsel* is not to be fettered by such submissions and is to determine the fair and equitable allocation in accordance with his or her own judgment and opinion. Until allocation is agreed or determined by *senior counsel*, the *insurer* shall continue to advance *defence costs* based on the allocation determined by the *insurer*. Any agreement or decision on allocation shall be applied retrospectively.

62.    Section 3.47 of the Policy defines *senior counsel* as "a senior lawyer to be mutually agreed upon by the parties, or in the absence of agreement, to be appointed by the head of the bar association or law society (or equivalent organisation) in the jurisdiction in which the *claim* is made."

63.    More than fourteen (14) days have passed since the Debtor made demand for reimbursement under the Policy.

64.    The Debtor and AIG have been unable to agree on an allocation in accordance with Section 5.10.

65.    Pursuant to Section 5.10, where the Debtor and AIG cannot agree on an allocation within fourteen (14) days, the Debtor is entitled to refer the determination to *senior counsel*, to

408205.docx

be mutually agreed upon by the parties.  The Debtor has elected to invoke this right under the Policy.

66.     In the absence of agreement between the Debtor and AIG as to mutually agreeable *senior counsel*, this individual is to be appointed by the head of the bar association or law society in the jurisdiction in which the *claim* is made.

67.     The D&O Defendants asserted claims of indemnity in the Debtor's bankruptcy matter pending in the United States Bankruptcy Court for the Northern District of Georgia.

68.     The Debtor's proceeds to fund the Evolution Settlement and D&O Defendants' defense costs in connection with the Evolution Action were further disbursed with the approval and supervision of this Court.

69.     In the event the Debtor and AIG cannot select mutually agreeable *senior counsel*, the Policy accordingly requires that this individual be appointed by the head of the appropriate bar association or law society in the Northern District of Georgia.

70.     To the extent the CDC Liquidation Trust is not presently entitled to damages pursuant to Count I for Breach of Contract, Plaintiff has no adequate remedy at law for AIG's nonperformance under the Policy.

71.     Plaintiff has complied with all conditions precedent under the Policy, including those contained in Section 5.10, such that it is presently entitled to specific performance of its rights thereunder.  Alternatively, compliance with any conditions precedent has been excused or waived.

72.     Plaintiff has done or offered to do, or is ready and willing to do, all the material acts required of it by the Policy.

408205.docx

73.    Whether *senior counsel* is mutually agreed upon by the parties or otherwise appointed, the CDC Liquidation Trust, as successor-in-interest to the Debtor, is entitled to specific performance of its present right under Section 5.10 of the Policy to refer any and all allocation issues for determination by *senior counsel*.

WHEREFORE, CDC Liquidation Trust requests that this Court:

(i)  enter a judgment requiring the Defendant to specifically perform in accordance with Section 5.10 of the Policy and related provisions and to cooperate with the CDC Liquidation Trust to select *senior counsel* in order to determine a fair and equitable allocation of the Policy proceeds; or, alternatively,

(ii)  in the event of the Debtor's and Defendant's inability to select mutually agreeable counsel, enter a judgment appointing *senior counsel* located in the Northern District of Georgia to determine a fair and equitable allocation of the Policy proceeds; and,

(iii)  grant such further and other relief as the Court deems proper.

DATED this 5th day of June, 2013.

Respectfully submitted,
**LAMBERTH, CIFELLI, STOKES,
  ELLIS & NASON, P.A.**

 */s/ James C. Cifelli*
**James C. Cifelli**
Georgia Bar No. 125750
jcifelli@lcsenlaw.com
**Gregory D. Ellis**
Georgia Bar No. 245310
GEllis@lcsenlaw.com
3343 Peachtree Road NE
Suite 550
Atlanta, GA 30326
Telephone:  (404) 262-7373
Facsimile:  (404) 262-9911
*Counsel for the CDC Liquidation Trust*

408205.docx

16

and

**VER PLOEG & LUMPKIN, P.A.**

**Jason S. Mazer**[4]
Florida Bar No. 0149871
jmazer@vpl-law.com
**Cary D. Steklof**
Florida Bar No.  86257
mailto:csteklof@vpl-law.com
100 S.E. 2nd Street, 30th Floor
Miami, Florida 33131
Telephone:  (305) 577-3996
Facsimile:  (305) 577-3558
*Special Insurance Counsel for CDC*
*Liquidation Trustee*

---

[4] *Pro Hac Vice* motions for Jason S. Mazer and Cary D. Steklof to be filed.

408205.docx

Exhibit "A" follows

**Lockton Professional and Financial Risks**
**Insurance Document: B0713SPRDW1000311**

Directors and Officers Liability Insurance Policy

Reference Number: SPRDW1000311

Issued by

LOCKTON COMPANIES LLP

**IMPORTANT NOTE;**

**This is a 'claims made' policy with strict claims notification provisions – please see within.**

**Important information – please read**
**Insurance Documentation: B0713SPRDW1000311**

**Introduction**

I am pleased to provide the insurance documentation evidencing the contract of insurance that Lockton Companies LLP have arranged on your behalf.

This document details the cover provided under the contract of insurance between the insured and the insurers, and it is essential for you to read this document thoroughly to familiarise yourself with the terms and conditions, limitations, and exclusions specified herein.

**Your obligations**

In accordance with your instructions we have effected the following insurance cover.

Please examine this document carefully and advise us immediately if you consider that the cover is not correct, does not meet with your requirements, or if you have any questions about your insurance security.  We will be happy to address your concerns.

We would draw attention to your obligation to inform insurers of all material information prior to the inception of the period of insurance.  Throughout the period of insurance you have a continuing duty of disclosure.  Any material change during this time must be advised to us immediately for insurers' reconsideration of your risk.  Failure to provide all material facts or notify all material changes may give insurers the right to avoid the contract of insurance.  If you have concerns on whether or not information is material, we advise you to disclose it.

The terms and conditions of your insurance are set out in this document and we strongly advise that you acquaint yourself with them and in particular your responsibilities in respect of all warranties and conditions, including any subjectivities.  These are serious terms and any failure to comply may entitle insurers to repudiate cover.

**Claims**

It is vitally important for you to appreciate that this insurance is underwritten on a "claims made" basis.  This means that any claims are dealt with under the terms of the policy in force at the time the claim or circumstance is notified and not the policy that was in force at the time of the original error or omission that has led to the claim.

If you become aware of a claim or circumstances which could give rise to a claim against you, it is essential that you notify us promptly, even if you believe that your actions have been beyond reproach and that a claim against you would never succeed.

If you have any queries whatsoever we are happy to help.

**B0713SPRDW1000311**
**Insurers:**

_____

**INSURERS:**

**Chartis Insurance UK Limited**                                      **100.0000** %
                                                                      **100.0000** %

Signed on behalf of Lockton Companies LLP

Professional Risks                          Director – Professional Risks

| | |
|---|---|
| **TYPE:** | Directors and Officers Liability Insurance |
| **INSURED:** | CDC Corporation |
| **ADDRESS:** | 11/F ING Tower,<br>308 Des Voeux Road,<br>Central Hong Kong |
| **PERIOD:** | From 15th December 2010 to 15th December 2011, both days at 00.01am, Local Standard Time at the principal address. |
| **INTEREST:** | As per policy. |
| **SUM INSURED:** | USD 10,000,000 in the aggregate all claims or losses (costs inclusive) |

**SUB-LIMITS:**

**2.13  Environmental Violation Defence Cost** (payable in addition to the limit of liability):
USD 1,000,000 in the aggregate for all Environmental Violation

**1.2  Special Excess Protection for Non-Executive Directors:**
a)  USD 1,000,000 Per Non-Executive Director
b)  USD 6,000,000 aggregate limit for all Non-Executive Directors

**1.4  Company Crisis Loss:**
USD 50,000

**2.3  Emergency Costs:**
USD 2,000,000

**2.6  Extradition Proceedings:**
Counselling and Tax Advisor – USD 100,000
PR Costs – USD 100,000

**2.9  Regulatory Crisis Response Costs:**
USD 100,000

**RETENTION:**

<u>US Claim</u>
Any Securities Claim – USD 1,000,000
Any Employment Practice Claim – USD 100,000
Any other Claim – USD 250,000

<u>Rest of World Claim</u>
Any Securities Claim – USD 1,000,000
Any Employment Practice Claim – USD 50,000
Any other Claim – USD 150,000

| | |
|---|---|
| **SITUATION:** | Worldwide |
| **CONDITIONS:** | Wording:  Chartis CorporateGuard D&O (CICGWG190110) as |

Page 4

attached.

### Insurance Covers and Extensions:

| | | |
|---|---|---|
| 1.1 Management Liability | - | Covered |
| 1.2 Special Excess for Non-Exec Directors | - | Covered |
| 1.3 Company Securities Liability | - | Covered |
|     U S SEC Exposure | | |
| 1.4 Company Crisis Loss | - | Covered |
| | | |
| 2.1 Discovery Period | - | Covered |
| 2.2 Lifetime Run-Off for Retired Insured Persons - | | Covered |
| 2.3 Emergency Costs | - | Covered |
| 2.4 Investigations | - | Covered |
| 2.5 Corporate Manslaughter | - | Covered |
| 2.6 Extradition Proceedings | - | Covered |
| 2.7 Public Relations Expenses | | |
|     (except 2.6 (ii) (b)) | - | Covered |
| 2.8 Assets and Liberty Costs | - | Covered |
| 2.9 Regulatory Crisis Response Costs | - | Covered |
| 2.10 Interpretive Counsel – International Securities Laws | | |
| | - | Covered |
| 2.11 New Subsidiaries | - | Covered |
| 2.12 International Jurisdiction Extension | - | Not Covered |
| 2.13 Environmental Extension | - | Covered |

### Endorsements:

- Sanction Endorsement (Compulsory) as attached.
- Professional Indemnity Exclusion – Failure to supervise with shareholder carveback as attached.

Proposal Form dated: 14th December 2010.

| | |
|---|---|
| **CHOICE OF LAW & JURISDICTION:** | This insurance shall be governed by and construed in accordance with the law of England and Wales and each party agrees to submit to the exclusive jurisdiction of the courts of England and Wales. |
| **PREMIUM:** | USD 170,000 |
| **PAYMENT TERMS:** | Premium Payment Clause LSW3000 (12/02/2011) – copy attached. |
| **TAXES PAYABLE BY THE INSURED AND ADMINSTERED BY INSURERS:** | As per Tax Schedule – to be agreed. |

## INFORMATION

**INFORMATION:**
- Proposal Form signed and dated 14th December 2010.
- Publicly filed Financials and Press Releases.

| SECURITY DETAILS |
|---|

**INSURERS LIABILITY:**

**(Re)Insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or in the case of a Lloyd's syndicate, the total of proportions underwritten by all members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where the contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**LMA 3333**

## PREMIUM PAYMENT CLAUSE

The (Re)Insured undertakes that premium will be paid in full to Underwriters by 12th February 2011 (or, in respect of instalment premiums, when due).

If the premium due under this policy has not been so paid to Underwriters by the 12th February 2011 (and, in respect of instalment premiums, by the date they are due) Underwriters shall have the right to cancel this policy by notifying the (Re)Insured via the broker in writing. In the event of cancellation, premium is due to Underwriters on a pro rata basis for the period that Underwriters are on risk but the full policy premium shall be payable to Underwriters in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this policy.

It is agreed that Underwriters shall give not less than 15 days prior notice of cancellation to the (Re)Insured via the broker. If premium due is paid in full to Underwriters before the notice period expires, notice of cancellation shall automatically be revoked. If not, the policy shall automatically terminate at the end of the notice period.

Unless otherwise agreed, the Leading Underwriter (and Agreement Parties if appropriate) are authorised to exercise rights under this clause on their own behalf and on behalf of all Underwriters participating in this contract.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

Where the premium is to be paid through a London Market Bureau, payment to Underwriters will be deemed to occur on the day of delivery of a premium advice note to the Bureau.

11/01
LSW3000

## LINES CLAUSE

This Insurance, being signed for 100% of 100% insures only that proportion of any loss, whether total or partial, including but not limited to that proportion of associated expenses, if any, to the extent and in the manner provided in this Insurance.

The percentages signed in the Table are percentages of 100% of the amount(s) of Insurance stated herein.

NMA2419

CorporateGuard

Directors & Officers Liability Insurance

|  | **Policy number** | SPRDW1000311 |
|---|---|---|

| 1 | **Policyholder** | CDC Corporation |
|---|---|---|

| 2 | **Registered address** | 11/F ING Tower,<br>308 Des Voeux Road,<br>Central Hong Kong |
|---|---|---|

| 3 | **Policy period** | From: 15th December 2010 |
|---|---|---|
|  |  | To: 15th December 2011 |
|  |  | Both Days at 00.01am Greenwich Mean Time. |

| 4 | **Limit of Liability** | | **USD 10,000,000** |
|---|---|---|---|
|  | **Environmental Violation Defence Cost**<br>(Payable in addition to the limit of liability) | In the aggregate for all Environmental Violation:<br><br>(no greater than 10% of the limit of liability, up to a maximum of GBP 2,000,000 in total) | USD 1,000,000 |
| 5 | **Special Excess Protection for Non-Executive Directors**<br><br>(Payable in addition to the limit of liability) | a) Per Non-Executive Director limit:<br><br>(10% of the limit of liability up to a maximum of GBP 1,000,000) | USD 1,000,000 |

| | | |
|---|---|---|
| | b) Aggregate limit for all Non-Executive Directors: | USD 6,000,000 |
| | (60% of the limit of liability up to a maximum of GBP 6,000,000) | |

## 6 Retention

| | | |
|---|---|---|
| **US Claim** | Any Securities Claim | USD 1,000,000 |
| | Any employment practice claim: | USD 100,000 |
| | Any other claim: | USD 250,000 |
| **Rest of World Claim** | Any Securities Claim: | USD 1,000,000 |
| | Any employment practice claim: | USD 50,000 |
| | Any other claim: | USD 150,000 |

## 7 Sub-limits of liability

**Insurance Cover**                                                    **Total Aggregate Limit GBP**

| | | |
|---|---|---|
| 1.4 | Company Crisis Loss | USD 50,000 |
| **Extension** | | |
| 2.3 | Emergency Costs | USD 2,000,000 (20% of the limit of liability) |
| 2.6 (ii) (a) | Extradition Counselling and Tax Advisor costs | USD 100,000 |
| 2.6 (ii) (b) | Extradition Public Relations Expenses | USD 100,000 |
| 2.7 | Public Relations Expenses (except 2.6 (ii) (b)) | USD 100,000 |

| 2.9 | Regulatory Crisis Response | USD 100,000 |
| **Exclusion 4.2** | Bodily Injury/Property Damage Defence Costs | USD 2,000,000 (20% of the limit of liability) |

Sub-limits of liability shown are the total amount payable under all Insurance Covers purchased and Extensions combined.

| 8 | **Continuity Date:** | Not Applicable |

| 9 | **Discovery periods:** | |
| | 1 year: | 100% of the full annual premium in effect at the expiry of the policy period |
| | 2 years: | 150% of the full annual premium in effect at the expiry of the policy period |

| 10 | **Co-insurance percentage** | Securities Claims (Insurance Clause 1.3) only: |
| | | Insurer: % |
| | | Company: % |
| 11 | **Total Premium** | **USD 170,000** |

| 12 | **Insurance Covers and Extensions** | Only Insurance Covers and Extensions designated as "Covered" below are "Provided" under this policy. "Not Covered" means "Not Provided". |
| | US SEC Exposure | Insurance Cover 1.3 | Covered |
| | Management Liability | Insurance Cover 1.1 | Covered |
| | Special Excess Protection for Non-Executive Directors | Insurance Cover 1.2 | Covered |
| | Company Securities Liability | Insurance Cover 1.3 | Covered |
| | Company Crisis Loss | Insurance Cover 1.4 | Covered |
| | Discovery Period | Extension 2.1 | Covered |
| | Lifetime Run-Off for Retried Insured Persons | Extension 2.2 | Covered |
| | Emergency Costs | Extension 2.3 | Covered |

| | | |
|---|---|---|
| Investigations | Extension 2.4 | Covered |
| Corporate Manslaughter | Extension 2.5 | Covered |
| Extradition Proceedings | Extension 2.6 | Covered |
| Public Relations Expenses | Extension 2.7 | Covered |
| Assets and Liberty Costs | Extension 2.8 | Covered |
| Regulatory Crisis Response | Extension 2.9 | Covered |
| Interpretive Counsel - International Securities Laws | Extension 2.10 | Covered |
| New Subsidiaries | Extension 2.11 | Covered |
| International Jurisdiction Extension | Extension 2.12 | Not Covered |
| Environmental Extension | Extension 2.13 | Covered |

**13    % Change in US Market Cap**            20%

**14    Endorsements**

Reference & Description                 Effective Date:

1.  Sanction Endorsement                1.  15th December 2010

2.  Professional Indemnity Exclusion –   2.  15th December 2010
    Failure to supervise with shareholder
    carveback as attached.

In consideration of the payment of the premium or agreement to pay the premium the *insurer* and the *policyholder* agree as follows:

## 1.    Insurance Covers

### 1.1    Management Liability

#### (i)    Individuals

The *insurer* shall pay the *loss* of each *insured person* except to the extent that the *insured person* has been indemnified by the *company* for such *loss*.

#### (ii)    Outside Entity Directors

The *insurer* shall pay the *loss* of each *outside entity director* except to the extent that the *outside entity director* has been indemnified by the *company* for such *loss*.

#### (iii)    Company Reimbursement

The *insurer* shall reimburse or pay on behalf of a *company* any *loss* for which it has indemnified an *insured person*.

### 1.2    Special Excess Protection for Non-Executive Directors

The *insurer* shall pay the *non-indemnifiable loss* of each and every *non-executive director*, up to the *per non-executive director special excess limit*, when:

(i)    the *limit of liability*;

(ii)    all other applicable management liability insurance, whether specifically written as excess over the *limit of liability* of this policy or otherwise; and

(iii)    all other indemnification for *loss* available to any *non-executive director*,

have all been exhausted.

The *insurer's* liability under this Insurance Cover 1.2 for all *non-executive directors* is subject to the *non-executive director special excess aggregate limit*.

### 1.3    Company Securities Liability

The *insurer* shall pay the *loss* of each *company* arising from a *securities claim*.

### 1.4    Company Crisis Loss

The *insurer* shall pay the *crisis loss* (including *delisting crisis loss*) of a *company* solely with respect to a *crisis* (including a *delisting crisis*) occurring during the *policy period* or the *discovery period* (if applicable) and reported to the *insurer* pursuant to the terms of this policy, up to the amount referred to in Item 7 of the Schedule. This Insurance Cover 1.4 shall apply regardless of whether a *claim* is ever made against an *insured* arising from such *crisis* and, in the case where a *claim* is made, regardless of whether the amount is incurred prior to or subsequent to the making of the *claim*.

## 2. Extensions

### 2.1 Discovery Period

If this policy is not renewed or replaced with a management liability policy, the *policyholder* will be entitled to a *discovery period*:

(i) automatically of 60 days; or

(ii) for a longer period as specified in Item 9 of the Schedule, subject to the *policyholder* making a request for such *discovery period* and paying any additional premium required, no later than 30 days after expiry of the *policy period*.

A *discovery period* is non-cancellable but shall not apply in the event of a *transaction*. However, in the event of a *transaction,* upon written request of the *policyholder,* the *insurer* may quote a *discovery period*. In considering such request, the *insurer* shall be entitled to fully underwrite the exposure and to extend such offer on whatever terms, conditions and limitations that the *insurer* reasonably deems appropriate.

### 2.2 *Lifetime Run-Off for Retired Insured Persons*

The *insurer* shall provide an unlimited *discovery period* for any *insured person* who retires or resigns, other than by reason of a *transaction,* prior to or during the *policy period*; provided that:

(i) this policy is not renewed or replaced with management liability cover; or

(ii) where this policy is renewed or replaced with management liability cover, such renewal or replacement policy does not provide an extended discovery provision of at least 6 years for such *insured person.*

### 2.3 Emergency Costs

If the *insurer's* written consent cannot be obtained within a reasonable time before *defence costs* are incurred with respect to any *claim,* or costs are incurred with respect to a *crisis loss,* then *the insurer* shall give retrospective approval for such costs up to, in the aggregate, the amount referred to in Item 7 of the Schedule.

### 2.4 Investigations

The *insurer* shall pay the *investigation costs* of each *insured person* arising from an *investigation.*

### 2.5 Corporate Manslaughter

The *insurer* shall pay the *loss* of any *insured person* with respect to any proceeding brought against them for *corporate manslaughter.*

### 2.6 Extradition Proceedings

The *insurer* shall pay:

(i) the reasonable fees, costs and expenses incurred by any *insured person* with respect to any *extradition proceeding*;

(ii) up to the amount referred to in Item 7 of the Schedule for the reasonable fees, costs and expenses incurred by any *insured person* for each of (a) and (b) below:

a) accredited counsellor or tax advisor retained by an *insured person* approved by the *insurer*, directly in connection with *extradition proceedings* brought against such *insured person*; or

b) *public relations consultants* to provide *public relations services* in connection with *extradition proceedings.*

## 2.7 Public Relations Expenses

Except where covered under Extension 2.6, the *insurer* shall pay up to the amount referred to in Item 7 of the Schedule for the reasonable fees, costs and expenses incurred by any *insured person* for *public relations services* in connection with a covered *claim* or *investigation.*

## 2.8 Assets and Liberty Costs

The *insurer* shall pay:

(i) any *bail bond and civil bond premium*; and

(ii) the reasonable fees, costs and expenses incurred by any *insured person* with respect to any *asset and liberty proceeding.*

## 2.9 Regulatory Crisis Response

In addition to *defence costs* and *investigation costs,* the *insurer* will pay up to the amount referred to in Item 7 of the Schedule for the reasonable fees, costs and expenses incurred by an *insured* in retaining legal advisers to respond to a *critical regulatory event.*

## 2.10 Interpretive Counsel - International Securities Laws

The term *defence costs* expressly includes reasonable costs and expenses incurred by *insured persons* for counsel within their home jurisdiction to interpret and apply advice received from counsel in a foreign jurisdiction in response to any *securities claim* in such other jurisdiction.

## 2.11 New Subsidiaries

If the *policyholder* during the *policy period* obtains *control* of any entity either directly or indirectly through one or more other entities, then the term *subsidiary* shall be extended to include that entity automatically, unless at the time of the *policyholder* obtaining such *control*, such entity:

(i) has total gross assets which are more than 25% of the consolidated gross assets of the *company* at the inception date of this policy; or

(ii) has and continues to have any of its *securities* listed on any exchange or market in the United States of America, its territories or possessions.

However, with respect to any entity referred to in (i) or (ii) above, this policy shall automatically extend to provide cover for 30 days after the date the policyholder obtained control of such entity;

provided that the *policyholder* shall provide to the *insurer* in writing details of such entity as soon as practicable prior to the end of the 30 day period referred to above, or the *policy period,* whichever is earlier. At the *policyholder's* request, cover may be extended for a longer period of time provided that the *policyholder* gives the *insurer* sufficient details to permit the *insurer* to assess and evaluate its exposure with respect to such entity and accepts any consequent amendment to the policy terms and conditions, including payment of any additional premium required by the *insurer*. Any such amended terms and conditions shall only apply after expiry of the 30 day period referred to above.

**2.12  International Jurisdiction Extension**

Unless prohibited from doing so by law or regulation, this policy shall apply to any *claim* made against any *insured* or any *crisis loss* occurring anywhere in the world.

With respect to *claims* brought and maintained solely in an *international jurisdiction* against an *insured,* the *insurer* shall apply to such *claims* those terms and conditions (and related provisions) of any *international policy* that are more favorable to such *insured* than the terms and conditions of this policy. However, this paragraph shall only apply to Section 1 - Insurance Covers and Section 3 - Definitions of this policy and the comparable general provisions of the *international policy*.

**2.13   Environmental Extension**

The *insurer* shall pay, in addition to the aggregate *limit of liability*, *defence costs* incurred by any *insured person* for an *environmental violation*, up to the total maximum amount set forth in Item 4 of the Schedule.

## 3.     Definitions

In this policy the following words in italics shall have the definitions that follow:

**3.1    *Approved Person***

any natural person employed by any *company* to whom the Financial Services Authority has given its approval to perform one or more Significant Influence Functions under Section 59 of the Financial Services and Markets Act 2000.

**3.2    *Asset and Liberty Proceeding***

any proceeding brought against an *insured person* by any *official body* seeking:

(i)     confiscation, assumption of ownership and control, suspension or freezing of rights of ownership of real property or personal assets of an *insured person*;

(ii)    a charge over real property or personal assets of such *insured person*;

(iii)   a temporary or permanent prohibition on such *insured person* from holding the office of or performing the function of a director or officer;

(iv)   a restriction of such *insured person's* liberty to a specified domestic residence or an official detention; or

(v)    deportation of an *insured person* following revocation of otherwise proper, current and valid immigration status for any reason other than such *insured person's* conviction of a crime.

**3.3**  ***Bail Bond and Civil Bond Premium***

the premium (but not collateral) for any bond or other financial instrument arising out of a covered judgment or required by a court hearing a *claim*.

**3.4**  ***Claim***

(i)

      a)    a written demand;

      b)    a civil, regulatory, mediation, administrative or arbitration proceeding, including any counter-claim or any proceeding with respect to an *employment practices violation*; or

      c)    a criminal proceeding,

      made or brought against an *insured person* alleging a *wrongful act*;

(ii)    a *securities claim*;

(iii)    an *extradition proceeding*;

(iv)    an *asset and liberty proceeding*;

(v)    *investigation* with respect to *insured persons*; or

(vi)    a Derivative Claim made against an *insured person* arising under Part 11, Chapter 1 of the Companies Act 2006 upon receipt by a *company* of any formal notice relating to an application to the court for permission to continue a Derivative Claim under the Companies Act 2006.

(vii)    a request to waive or toll the statute of limitations.

**3.5**  ***Company***

(i)    the *policyholder*;

(ii)    any *subsidiary*; or

(iii)    the debtor- in- possession, in the event a bankruptcy proceeding shall be instituted by or against the entities referred to in (i) and (ii) above (or equivalent status outside the United States, if any).

**3.6**  ***Continuity Date***

the applicable date specified as such in Item 8 of the Schedule.

**3.7**  ***Control***

the securing of the affairs of an entity by means of:

(i)    controlling the composition of the board of directors of such entity;

(ii)    controlling more than half of the shareholder or equity voting power of such entity;

(iii)    holding more than half of the issued share or equity capital of such entity; or

(iv)    creation of such entity.

**3.8**  ***Corporate Manslaughter***

a gross breach of duty of care causing the death of another person.

**3.9  Crisis**

as defined in Appendix A attached to this policy.

**3.10  Crisis Loss**

as defined in Appendix A attached to this policy.

**3.11  Critical Regulatory Event**

(i)  a raid on, or on-site visit to, any *company* which first takes place during the *policy period* by any regulator that involves the production, review, copying or confiscation of files or interviews of any *insured person*;

(ii)  a public announcement relating to the foregoing; or

(iii)  the receipt by an *insured* during the *policy period* from any regulator of a formal notice which legally compels the *insured* to produce documents to, or answer questions by or attend interviews with that regulator.

**3.12  Defence Costs**

(i)  emergency costs under Extension 2.3-Emergency Costs;

(ii)  reasonable fees, costs and expenses, incurred with the *insurer's* prior written consent, by or on behalf of an *insured* after a *claim* is made, directly in connection with its investigation, defence, settlement or appeal;

(iii)  the reasonable fees, costs and expenses of an accredited expert, retained through defence counsel, approved by the *insurer* on behalf of an *insured* to prepare an evaluation, report, assessment, diagnosis or rebuttal of evidence in connection with the defence of a covered *claim*; or

(iv)  reasonable fees, costs and expenses extended pursuant to Extension 2.10 - Interpretive Counsel-International Securities Laws.

*Defence costs* shall not include remuneration of any *insured*, cost of their time or costs or overheads of any *company*.

**3.13  Director or Officer**

any natural person director or officer of a *company*.

**3.14  Discovery Period**

a period immediately following expiry of the *policy period* during which written notice may be given to the *insurer* of a *claim* first made during such period or the *policy period*, for:

(i)  a *wrongful act* occurring prior to the expiry of the *policy period*; or

(ii)  in the case of an *investigation*, *extradition proceedings*, or *asset and liberty proceedings*, matters which occurred or arose prior to the expiry of the *policy period*.

**3.15  Employment Practice Violation**

any actual or alleged act, error or omission with respect to any employment or prospective employment of any past, present, future or prospective employee or *insured person* of any *company* or *outside entity*.

**3.16  Environmental Condition**

(i) the actual, alleged or threatened discharge, dispersal, release or escape of pollutants (as defined by applicable local legislation), including greenhouse gases or (ii) any regulator direction or request to test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize pollutants (as defined by applicable local legislation), including greenhouse gases that may result in a *non-indemnifiable loss* to an *insured person*.

**3.17  Environmental Violation**

any *claim* based upon, arising out of or attributable to an *environmental condition* if and to the extent such *claim*:  (i) is a *securities claim*; (ii) is an *employment practice violation* against an *insured person*;  (iii) is against an *insured person* for *wrongful acts* in connection with misrepresenting or failing to disclose information as governed by any statute, regulation, rule or common law regulating or creating liability for an *environmental condition*; or (iv) results in a *non-indemnfiable loss* to any *insured person*.

**3.18  Extradition Proceeding**

any extradition proceeding against an *insured person* including any related appeal, any judicial review applications challenging the designation of a territory for the purposes of extradition law, any challenge or appeal of any extradition decision by the responsible governmental authority, or any applications to the European Court of Human Rights or similar court.

**3.19  Final Adjudication**

means in respect of any conviction, judgment, or refusal of relief by a judicial or arbitral tribunal:

(i)     if not appealed against, when the period in which an appeal must be brought has expired; or

(ii)    if appealed against, when such appeal has been determined, abandoned or otherwise ceased.

**3.20  Insolvency**

means the inability of a *company* to pay its debts as they fall due, as determined in accordance with Section 123 of the Insolvency Act 1986.

**3.21  Insured**

any *company* and any *insured person*.

**3.22  Insured Person**

any natural person who was, is or during the *policy period* becomes:

(i)     a *director* or *officer*, but not an external auditor or insolvency office-holder of a *company*;

(ii)    an *approved person*;

(iii)   a *non-executive director*;

(iv)    an employee of a *company*;

(v)     a *shadow director*;

(vi)   a de facto director or prospective director named as such in any listing particulars or prospectus issued by a *company*;

(vii)  an *outside entity director*;

(viii) a *senior accounting officer*;

but only when and to the extent that such *insured person* is acting for and on behalf of the *company* in any of the capacities referred to in (i) to (viii) above.

(ix)   *Insured person* is extended to include:

    a)   the spouse or domestic partner (including same sex relationship civil partnerships pursuant to the Civil Partnership Act 2004); and

    b)   the administrator, heirs, legal representatives, or executor of a deceased, incompetent, insolvent or bankrupt estate,

of an *insured person* referred to in (i) to (viii) above, for *wrongful acts* of such *insured person*.

### 3.23  **Insurer**

Chartis UK Limited.

### 3.24  **International Jurisdiction**

any jurisdiction other than the country in which the policy is issued.

### 3.25  **International Policy**

the *insurer's* or any other company of Chartis, Inc. standard directors and officers liability policy (including all mandatory endorsements, if any) existing at the inception date of this policy approved by Chartis to be sold within an *international jurisdiction* that provides coverage substantially similar to the coverage afforded under this policy. Where more than one such standard policy exists at the inception date of this policy, then *international policy* means the standard policy most recently registered in that *international jurisdiction* prior to the inception date of this policy. The term *international policy* shall not include any partnership, managerial, crime, pension trust, casualty or professional liability coverage.

### 3.26  **Investigation**

any formal hearing, examination, investigation or inquiry by an *official body* into the affairs of a *company*, or an *insured person* of such entity, once an *insured person*:

    a)   is required to attend;

    b)   is identified in writing by an investigating *official body* as a target of the hearing, examination or inquiry; or

    c)   in the case of the *SEC*, is served with a subpoena or Wells Notice.

An *investigation* shall be deemed to be first made when the *insured person* is first so required, identified or served.

Page 21

**3.27 *Investigation Costs***

the reasonable fees, costs and expenses incurred by or on behalf of an *insured person* with the *insurer's* prior written consent for the principal purpose of preparing for and attending an *investigation.* However, *investigation costs* shall not include remuneration of an *insured person,* cost of their time or costs or overheads of any *company.*

**3.28 *Limit of Liability***

The amount referred to in Item 4 of the Schedule.

**3.29 *Loss***

any amount which the *insured* is legally liable to pay resulting from a *claim* made against an *insured* including *crisis loss, defence costs, investigation costs,* awards of damages (including aggravated, punitive and exemplary damages), awards of costs or settlements (including claimant's legal costs and expenses), pre and post- judgment interest on a covered judgment or award, fines and penalties and the multiplied portion of multiple damages. Enforceability of this paragraph for punitive, exemplary and multiple damages shall be governed by the applicable law that most favours coverage for such damages. *Loss* shall include any amount covered under any Extension of this policy.

*Loss* shall not include:

(i)     criminal fines and penalties;

(ii)    taxes or remuneration of any *insured person,* except where and to the extent that personal liability of a *director or officer* under Insurance Covers 1.1 (i) and (ii) for non-payment of corporate taxes is established by law in the jurisdiction in which the *claim* is made and such liability constitutes *non-indemnifiable loss;*

(iii)   any reimbursement of the *company* required pursuant to Section 304 of *Sarbanes-Oxley*;

(iv)    employment-related benefits; nor

(v)     amounts which are uninsurable under the applicable law of the *claim.*

Notwithstanding the foregoing subparagraph (v), the *insurer* shall not assert that, in a *securities claim* alleging violations of Section 11 or 12 of the Securities Act of 1933 (US), the portion of any amounts incurred by *insureds* which is attributable to such violations constitutes uninsurable loss and shall treat that portion of all such settlements, judgments and *defence costs* as constituting *loss* under this policy.

With respect to Insurance Cover 1.3 only, in the event of a *claim* alleging that the price or consideration paid or proposed to be paid for the acquisition or completion of the acquisition of all or substantially all of the ownership interest in or assets of any entity is inadequate, *loss* with respect to such *claim* shall not include any amount of any judgment or settlement representing the amount by which such price or consideration is effectively increased; provided, however, that this paragraph shall not apply to *defence costs.*

**3.30 *Non-Executive Director***

any natural person who at the inception of the *policy period* serves, or during the *policy period* begins serving as a director of the *company* and who is not an employee of the *company.*

**3.31  Non-Executive Director Special Excess Aggregate Limit**

the sum specified in Item 5(b) of the Schedule being the aggregate limit for all *non-executive directors*.

**3.32  Non-Indemnifiable Loss**

*loss* of an *insured person* that a *company* is unable to indemnify due to legislative prohibition or *insolvency*.

**3.33  Official Body**

any regulator, government body, government agency, official trade body, or any other body that is empowered by statute to investigate the affairs of a *company* or an *insured person*.

**3.34  Outside Entity**

any entity (including any not-for-profit entity) except:

(i)  a *subsidiary*;

(ii)  any entity whose principal operations include a bank, clearing house, credit institution, undertaking for collective investment in securities, investment firm, investment advisor/manager, investment fund or mutual fund, private equity or venture capital company, stock brokerage firm, insurance company or similar entity; or

(iii)  any entity that has any of its *securities* listed on a securities exchange or market within the United States of America and is subject to any obligation to file reports with the *SEC* in accordance with Section 13 of the Securities Exchange Act 1934 (US),

unless listed by endorsement to this policy.

**3.35  Outside Entity Director**

any natural person who did or does, or during the *policy period* begins to serve, at the specific request or direction of a *company,* as a *director* or *officer, shadow director,* trustee (except a pension trustee), governor or equivalent of an *outside entity*.

**3.36  Per Non-Executive Director Special Excess Limit**

the sum specified in Item 5(a) of the Schedule being a separate limit for each *non-executive director*.

**3.37  Policyholder**

the organisation specified in Item 1 of the Schedule.

**3.38  Policy Period**

the period from the inception date to the expiry date specified in Item 3 of the Schedule.

**3.39  Public Relations Consultants**

public relations consultants retained by the *insured* with the *insurer's* prior written consent.

### 3.40  *Public Relations Services*

services provided by the *public relations consultants* to an *insured person* directly to mitigate the adverse effect or potential adverse effect on an *insured person's* reputation.

### 3.41  *Retention*

the applicable sum specified in Item 6 of the Schedule.

### 3.42  *Sarbanes-Oxley*

the Sarbanes-Oxley Act of 2002 (US) or the substantively equivalent laws, rules or regulations, applicable to *securities* or to the *policyholder* by virtue of such *securities*.

### 3.43  *SEC*

United States Securities and Exchange Commission.

### 3.44  *Security*

any security representing debt of or equity interests in a *company*.

### 3.45  *Securities Claim*

any *claim* made against an *insured*:

(i)  alleging a violation of any laws (statutory or common), rules or regulations regulating *securities*, the purchase or sale or offer or solicitation of an offer to purchase or sell *securities*, or any registration relating to such *securities*:

    a)  brought by any person or entity alleging, arising out of, based upon or attributable to the purchase or sale, or offer or solicitation of an offer to purchase or sell any *securities* of a *company*; or

    b)  brought by a *security* holder of the *company* with respect to such *security* holder's interest in *securities* of such *company*; or

(ii)  brought derivatively on behalf of a *company* by a *security* holder of that *company*.

*Securities Claim* shall not include an administrative or regulatory proceeding, or an investigation of a *company*.

Notwithstanding the foregoing, "*securities claim*" shall include an administrative or regulatory proceeding against a *company*, but only if and only during the time that such proceeding is also commenced and continuously maintained against an *insured person*.

S*ecurities Claim* shall also not include any *claim* by an employee or *director* or *officer* of a *company* alleging, arising out of, based upon or attributable to the loss of, or the failure to receive or obtain, the benefit of any *securities* (including any warrants or options).

### 3.46  *Senior Accounting Officer*

a *director or officer,* or employee of the *company*, acting in a managerial or supervisory capacity, who has overall responsibility for the accounting systems.

### 3.47  *Senior Counsel*

a senior lawyer to be mutually agreed upon by the parties, or in the absence of agreement, to be appointed by the head of the bar association or law society (or equivalent organisation) in the jurisdiction in which the *claim* is made.

### 3.48  *Shadow Director*

any natural person, who, as a consequence of being a *director, officer* or employee of any *company,* is deemed a shadow director, as defined in Section 250 of the Companies Act 2006, of any other company or any *outside entity.*

### 3.49  *Subsidiary*

any entity which the *policyholder controls* either directly or indirectly through one or more other entities on or before the inception date of this policy.

### 3.50  *Transaction*

any one of the following events:

(i)    the *policyholder* consolidates with or merges into or sells all or substantially all of its assets to any other person or entity or group of persons and/or entities acting in concert; or

(ii)   any person or entity, or persons or entities acting in concert (other than a *subsidiary* or *subsidiaries*) shall acquire *control* of the *policyholder.*

### 3.51  *US Claim*

a *claim* brought or maintained within the jurisdiction of, or based upon any laws of the United States of America, its states, localities, territories or possessions.

### 3.52  *US SEC Exposure*

means where a *company*:

(i)    has any of its *securities* listed on a securities exchange or market within the United States of America; or

(ii)   is or has *securities* that are legally required to be the subject of any registration statement filed with the *SEC*; or

(iii)  is subject to any obligation to file reports with the *SEC* in accordance with Section 13 of the Securities Exchange Act of 1934.

*US SEC Exposure* does not include any *security* purchased or sold pursuant to Rule 144A or Level 1 American Depository Receipts pursuant to the Securities Act of 1933.

### 3.53  *Whistleblowing*

where an *insured person* engages in any protected activity specified in 18 U.S.C. 1514(A) ("whistleblower" protection pursuant to the Sarbanes-Oxley Act of 2002 (US)) or any protected activity specified in any other "whistleblower" protection pursuant to any similar legislation.

### 3.54  *Wrongful Act*

(i)    with respect to any *insured person*:

a)    any actual or alleged act, error or omission by an *insured person* in any of the capacities listed in the definition of *insured person*; or any matter claimed against an *insured person* solely because of such listed capacity;

b)    any proposed act, error or omission or any default pursuant to section 260(3) of the Companies Act 2006;

Page 25

c) an *employment practice violation*; or

d) any actual or alleged act, error or omission, that forms the basis of, is connected to or that results in any violation of *Sarbanes-Oxley* anywhere in the world; including any such violation in connection with:

(1) audit committee service;

(2) *Sarbanes-Oxley* certification or disclosure requirements;

(3) GAAP reconciliation;

(4) *Sarbanes-Oxley* prohibitions of conflicts of interests; or

(5) employee whistle-blowing; and

(ii) with respect to any *company*: any actual or alleged act, error or omission by the *company*, but solely as respects a *securities claim*.

---

## 4.    Exclusions

The *insurer* shall not be liable for *loss*:

### 4.1    Conduct

arising out of, based upon or attributable to:

(i) the gaining of profit or advantage to which the *insured* was not legally entitled; or

(ii) the committing of any deliberately dishonest or deliberately fraudulent act,

in the event that any of the above is established by *final adjudication* against such *insured* or any formal written admission by such *insured*.

Notwithstanding anything stated in this Exclusion 4.1, (i) above shall not apply, in a *securities claim* alleging violations of Section 11 or 12 of the Securities Act of 1933 (US), to the portion of any *loss* attributable to such violations.

For the purposes of determining the applicability of this Exclusion 4.1, the conduct of any *insured person* shall not be imputed to any other *insured person*.

### 4.2    Bodily Injury/Property Damage

for bodily injury, sickness, disease, death or emotional distress, or mental anguish of any natural person; or damage to, or destruction, impairment or loss of use of any property. This exclusion shall not apply to:

(i) any *claim* for emotional distress or mental anguish with respect to *employment practices liability*; or

(ii) *defence costs* of any *insured person* up to the amount specified in Item 7 of the Schedule.

### 4.3    Prior Claims and Circumstances

arising out of, based upon or attributable to:

(i) facts alleged or the same or related *wrongful act(s)* alleged or contained in any *claim* which has been reported or in any circumstances of which notice has been given under any policy of which this policy is a renewal or replacement or which it may succeed in time; or

(ii)    any pending or prior civil, criminal, administrative or regulatory proceeding, investigation, arbitration or adjudication as of the *continuity date*, or alleging or deriving from the same or essentially the same facts as alleged in the pending or prior proceeding, investigation, arbitration or adjudication.

Exclusion 4.3 (i) shall not apply to any circumstances which have been notified to the *insurer* under any earlier policy but were not accepted by the *insurer* as a valid notification, and where cover has been maintained continuously with the *insurer* from the inception date of such earlier policy until the expiry date of this policy.

### 4.4    US Claims brought by Insureds

arising out of, based upon, or attributable to any *US claim* which is brought by or on behalf of any:

(i)     *company*;

(ii)    *outside entity* in which such *insured* serves or served as an *outside entity director*; or

(iii)   *insured person* of such *company* or *outside entity*.

This exclusion shall not apply to:

    a)    any *US claim* against any *insured person*:

        (1)    pursued by any security holder or member of a *company* or *outside entity*; whether directly or derivatively, or pursued as a class action; and that has not been solicited or brought with the voluntary (rather than legally required) intervention, assistance or active participation of any *director* or *officer* or any *company* or any *outside entity director*, other than a *director* or *officer* or *outside entity director* engaged in *whistleblowing*;

        (2)    for any *employment practice violation* brought or maintained by any *insured person*;

        (3)    pursued by an *insured person* for contribution or indemnity, if the *claim* directly results from another *claim* otherwise covered under this policy;

        (4)    pursued by any past *director or officer* or employee of a *company* or *outside entity*;

        (5)    pursued by an insolvency administrator, receiver, trustee or liquidator of any *company* or *outside entity* either directly or derivatively on behalf of a *company* or *outside entity*; or

    b)    *defence costs* of any *insured person*.

Exclusions 4.1, 4.2 and 4.4 shall not apply to *crisis loss*.

---

## 5.    General Provisions

### 5.1    Severable Nature of the Policy

This policy is a severable policy covering each *insured* for their own individual interest.

No statements made by or on behalf of any *insured* (including by an agent of the *insured*), nor any information or knowledge possessed by any *insured*, nor any conduct of any *insured*, shall be imputed to any other *insured person*, for the purpose of determining their entitlement to cover under this policy.

With respect to Insurance Cover 1.3 only, the statements made by, information or knowledge possessed by and any conduct of any past, present or future chief executive officer and/or chief financial officer (or equivalent executive or management position) of a *company* shall be imputed to that *company*; and the knowledge of the same officers of the *policyholder* shall be imputed to all *companies*.

## 5.2    Non-avoidance

This policy is not avoidable or rescindable in whole or in part and the *insurer* shall have no other remedy with respect to any non-disclosure or misrepresentation in connection with this policy, except with respect to (i) Insurance Cover 1.3- Company Securities Liability, or (ii) for any fraudulent misrepresentation or fraudulent non-disclosure of any *insured,* where established by *final adjudication*, or any formal written admission by or on behalf of any *insured.*

## 5.3    Limit of liability

The total amount payable by the *insurer* under this policy shall not exceed the *limit of liability,* (except with respect to Insurance Cover 1.2 – Special Excess Protection for Non-Executive Directors*)*, where the *insurer's* liability pursuant to this Extension is in addition to the *limit of liability*. The *insurer* shall have no liability in excess of all such limits, irrespective of the number of *insureds* or amount of any *loss,* including with respect to any *claim* specified in Section 5.6– Related Claims or Single Claims. Each sublimit of liability specified in the Schedule is the maximum the *insurer* shall pay for the cover to which it applies and is part of the *limit of liability*.

## 5.4    Retention & Coinsurance

The *retention* is not applicable to *non-indemnifiable loss* or Insurance Cover 1.4 - Company Crisis Loss. The *retention* is to be borne by the *companies* and shall be uninsurable. A single *retention* shall apply to all *loss* arising from any single *claim*.

If any *company* is legally permitted or required to indemnify an *insured person,* but fails to do so within 30 days, then the *insurer* shall advance all *loss* within the *retention* and such *retention* shall be repaid by the *company* to the *insurer* as soon as reasonably practicable.

In the event that an *insured person* becomes legally obligated to repay to a *company* monies advanced by the *company* on account of any *claim,* by reason of sections 234(3) and 205 of the UK Companies Act 2006, the *insurer* agrees to pay such amount to the *company* on behalf of the *insured person* promptly upon notification by the *policyholder* to the *insurer* of such *insured person's* obligation to repay.

In the event a *claim* triggers more than one of the *retention* amounts stated in Item 6 of the Schedule, then, as to that *claim,* the highest of such *retention* amounts shall be deemed the *retention* amount applicable to *loss* (to which a *retention* is applicable pursuant to the terms of this policy) arising from such *claim*.

For each *securities claim* made in whole or in part against any *company*, the defendant (or respondent) *company* shall, excess of the applicable *retention*, bear uninsured at its own risk and pay the coinsurance percentage proportion of such *loss* referred to in Item 10 of the Schedule. The *insurer's* liability hereunder with respect to *loss* of any *company* shall apply only to the remaining percentage of such *loss*, and the *insurer* shall have no obligation to pay to the extent that any applicable coinsurance is not paid by a *company*. Payments of coinsurance shall not be subject to and do not reduce any *limits of liability* under this policy.

**5.5    Reporting of Claims and Circumstances**

The covers provided under this policy are granted solely with respect to any *claim* that is reported to the *insurer* as soon as practicable after a *company's* Risk Manager or General Counsel (or equivalent position) first becomes aware of such *claim* but in all events no later than either:

during the *policy period* or *discovery period*; or

within 60 days after the end of the *policy period* or the *discovery period,* as long as notice is given to the *insurer* within 60 days after such *claim* was first made against an *insured.*

Any *insured* may, during the *policy period,* notify the *insurer* of any circumstance reasonably expected to give rise to a *claim.* The notice must include the reasons for anticipating that *claim,* and full relevant particulars with respect to dates, the *wrongful act (*if applicable) and the potential *insured persons* and claimant concerned.

All notifications relating to *claims* or circumstances must be in writing or sent by facsimile to:

Financial Lines Claims
Chartis UK Limited
2-8 Altyre Road
Croydon CR9 2LG

or by facsimile to +44 020 8680 7321

or by email to Claims.DO@chartisinsurance.com

**5.6    Related Claims or Single Claims**

If notice of a *claim* or circumstance is given as required by this policy, then any subsequent *claim* alleging, arising out of, based upon or attributable to the facts or *wrongful act* alleged in that *claim,* or described in that circumstance, shall be deemed to have first been made at the same time as that *claim* was first made, and reported to the *insurer* at the time the required notices were first provided.

Any *claim* or series of *claims* arising out of, based upon or attributable to continuous, repeated or related acts, errors or omissions, whether or not committed by more than one *insured* and whether directed to or affecting one or more person or entity; shall be considered a single *claim* for the purposes of this policy.

**5.7    Defence and Settlement of Claims**

All *insureds* shall at their own cost, render all reasonable assistance to and cooperate with the *insurer* in the investigation, defence, settlement or appeal of a *claim* or reported circumstance, and provide the *insurer* with all relevant information pertaining to any *claim* or circumstance, as it may reasonably require. In the event of any *claim* or potential *loss,* each *insured* shall take reasonable steps to reduce or diminish any *loss.*

Payment of any *crisis loss* under this policy shall not waive any of the *insurer's* rights under this policy or at law.

The *insured* shall have the obligation to defend and contest any *claim* made against them. The *insurer* shall be entitled to participate fully in the defence and in the negotiation of any settlement that involves or appears reasonably likely to involve the *insurer.*

The *insurer* shall accept as reasonable and necessary the retention of separate legal representation to the extent required by a material conflict of interest between any *insureds.*

If a *claim* is made against an *insured person* by the *company,* the *insurer* shall have no duty or obligation to communicate with any other *insured person* or the *company* in relation to that *claim*.

The applicable *insured* or *policyholder* shall reimburse the *insurer* for any payments which are ultimately determined not to be covered by this policy.

### 5.8  Payment of Defence Costs

The *insurer* shall advance all *defence costs, investigation costs* and all other covered costs and expenses, within 21 days after sufficiently detailed invoices for those costs are received and accepted for payment by the *insurer*.

### 5.9  Consent

The *insured* shall not admit or assume any liability, enter into any settlement agreement, consent to any judgment, or incur any *defence costs, investigation costs* or any other covered costs and expenses (except with respect to Extension 2.3 - Emergency Costs) without the prior written consent of the *insurer*. Only those settlements, judgments, and costs and expenses which have been consented to by the *insurer,* and only those *claims* defended in accordance with this policy, shall be payable as *loss* under this policy.

Where the *insurer's* consent is required pursuant to any provision of this policy, such consent shall not be unreasonably withheld or delayed.

### 5.10  Allocation

The *insurer* shall be liable only for *defence costs* or other *loss* derived exclusively from a covered *claim* against an *insured person* or a covered *securities claim* against a *company*.

If either:

(i)   a *claim* (other than a *securities claim*) is made jointly against:

    a)   any *insured person;* and

    b)   any *company* or any other person or entity; or

(ii)   a *claim* involves both covered and uncovered matters or persons under this policy,

then the *insured* and *the insurer* shall use commercially reasonable efforts to determine a fair and proper allocation of *loss* covered under this policy, on the basis of established judicial allocation principles which take into account the legal and financial exposures, and the relative benefits obtained by the relevant parties.

If the *insurer* and the *insured* cannot agree on allocation in accordance with this general provision within 14 days, then the *insured* may refer the determination to a *senior counsel,* whose decision shall be final and binding on all parties. The *senior counsel* is to determine the fair and equitable allocation as an expert, not as an arbitrator. The *insured* and the *insurer* shall be entitled to make written submissions to *senior counsel*. The *senior counsel* is to take account of the parties' submissions, but the *senior counsel* is not to be fettered by such submissions and is to determine the fair and equitable allocation in accordance with his or her own judgment and opinion. Until allocation is agreed or determined by *senior counsel,* the *insurer* shall continue to advance *defence costs* based on the allocation determined by the *insurer*. Any agreement or decision on allocation shall be applied retrospectively.

**5.11  Disputes between insurer and insureds**

Except as otherwise specifically provided in this policy, any dispute regarding any aspect of this policy or any matter relating to cover thereunder which cannot be resolved by agreement within 30 days, may be referred to binding arbitration by either party, upon giving 7 days notice to the other, in the London Court of International Arbitration (LCIA), whose rules shall be deemed incorporated by reference to this clause, and the cost shall be borne equally between the *insured* and *insurer*.

**5.12  Changes in Risk**

***Transactions***: The *insurer* shall not be liable for *loss* arising out of, based upon or attributable to a *wrongful act* committed after the effective date of a *transaction*.

***Subsidiaries***: Cover for any *subsidiary* or for any *insured person* of any *subsidiary,* shall apply only for acts, errors or omissions occurring while such *subsidiary* is a *subsidiary* and whilst such *insured person* serves in an *insured person* capacity. Cover for any *outside entity director* of an *outside entity* shall apply only for acts, errors or omissions occurring whilst the *outside entity* is an *outside entity* and whilst such *outside entity director* serves as an *outside entity director*. However, upon request by the *policyholder,* the *insurer* may provide cover for acts, errors or omissions occurring prior to the acquisition of any *subsidiary,* on whatever terms, conditions and limitations it deems appropriate including payment of any additional premium required by the *insurer*.

***US Securities***:

(i)    The following applies if *US SEC Exposure* is shown as "not covered" under Item 12 of the Schedule:

The *insurer* shall not be liable under this policy for any *loss* arising out of, based upon or attributable to any *US SEC Exposure* which the *policyholder* had or has prior to the inception date of this policy.

(ii)   The following applies if *US SEC Exposure* is shown as "covered" under Item 12 of the Schedule:

With respect to any *company* that is covered for a *US SEC exposure,* if during the *policy period* the US stock market capitalisation of such *company* exceeds the percentage specified in Item 13 of the Schedule as the individual or collective result of an offering or offerings of *securities,* then the *insurer* shall not be liable under this policy for any *loss* arising out of, based upon or attributable to any act, error, omission or *crisis loss* occurring after the date that such percentage is exceeded, where such act, error or omission or *crisis loss* is in connection with the *securities* offered or any related registration or reporting requirements.

However, where any *US SEC exposure* attaches during the *policy period* with respect to (i), or any change in stock market capitalisation occurs with respect to (ii), cover may be extended under this policy provided that the *policyholder* gives the *insurer* sufficient details to permit the *insurer* to assess and evaluate its exposure with respect to such; and accepts any consequent amendment to the policy terms and conditions, including payment of any additional premium required by the *insurer*. Any extension of cover pursuant to this provision must be agreed in writing by the *insurer* by endorsement to this policy.

### 5.13  Subrogation and Co-operation

In the event of any payment under this policy, the *insurer* shall be subrogated to the extent of such payment to all of the *insureds'* rights of recovery, contribution and indemnity. The *insureds* shall reasonably assist the *insurer* and shall do nothing to prejudice such rights. The *insurer* shall not exercise its rights of subrogation against an *insured person* in connection with a *claim* or *loss* unless it can establish that Exclusion 4.1 - Conduct, applies to that *claim* and to that *insured person*.

### 5.14  Order of payments

The *insurer* shall pay *loss* covered under this policy in the order in which such *loss* is presented to the *insurer* for payment. Should the *insurer* at its sole and absolute discretion, determine that the *limit of liability* will not be sufficient to cover all such *loss,* the *insurer* shall pay *loss* in the following order:

(i)    *loss* of *insured person* where the *company* has not indemnified such *insured perso*n;

(ii)   thereafter, with respect to any remaining balance of the *limit of liability* the *insurer* may, at its option, request the *policyholder* to elect in writing either to stipulate the order and the amounts in which *loss* is to be discharged, or to receive such balance to be held on behalf of any *insured* who has incurred such *loss*.

Payment pursuant to this order of payments clause shall fully discharge the *insurer* from its obligations under this policy.

### 5.15  Other Insurance & Indemnification

This policy shall always apply excess over any other valid and collectible insurance or indemnification available to the *insured,* including any management liability, pension trustee liability, employment practices liability, environmental impairment liability, product liability and general liability insurance.

With respect to *outside entities*, insurance provided by this policy applies excess over

(i)    any indemnification provided by the *outside entity*; and

(ii)   any other collectible management liability insurance issued to the *outside entity* for the benefit of its directors, officers or employees.

### 5.16  Notice and authority

The *policyholder* shall act on behalf of its *subsidiaries* and each and every *insured person* with respect to the giving of notice of *claim,* the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining of any right to a *discovery period*. In the event of a *transaction* or insolvency of the *policyholder* an *insured person* may act on their own behalf in giving notice of a *claim* or circumstance, and on behalf of all *insureds* if electing a *discovery period* and paying the applicable premium.

### 5.17  Assignment

Neither this policy nor any right hereunder may be assigned without written consent of the *insurer*.

### 5.18  Policy interpretation and Governing law

Any interpretation of this policy or issue relating to its construction, validity or operation shall be determined by the laws of England and Wales.

This policy, its Schedule, any endorsements, appendices and any subjectivity notice issued by the *insurer* at the inception of this policy are one contract in which, unless the context otherwise requires:

(i)     headings are descriptive only, not an aid to interpretation;

(ii)    singular includes the plural, and vice versa;

(iii)   the male includes the female and neuter;

(iv)    all references to specific legislation are English legislation unless otherwise stated and include amendments to and re-enactments of such legislation and similar legislation in any jurisdiction; and

(v)     references to positions, offices or titles shall include their equivalents in any jurisdiction.

No amendment of this policy shall be valid and binding on the *insurer* unless agreed in writing. Subjectivities may be removed by written confirmation from the *insurer* that states that the subjectivity no longer applies.

### 5.19   Cancellation of the policy

This policy may not be cancelled except for non-payment of the premium. If the premium is not paid within 60 days after inception of the *policy period*, the *insurer* may avoid this policy ab initio 10 days after the issue of written notice of avoidance to the *policyholder's* address specified in Item 2 of the Schedule or to the agent or broker of the *policyholder* at their registered address. The *insurer* shall not be liable for any *loss* under this policy unless and until the premium is paid.

### 5.20   Contracts (Rights of Third Parties) Act 1999

Nothing in this policy is intended to confer a directly enforceable benefit on any third party other than a *company* or *insured person,* whether pursuant to the Contracts (Rights of Third Parties) Act 1999 or otherwise.

### 5.21   Complaints

Every effort is made to ensure you receive a high standard of service. If you are not satisfied with the service you have received, you should contact:

Customer Relations Manager
Chartis UK Limited
2-8 Altyre Road
Croydon
CR9 2LG

Email: uk.customer.relations@chartisinsurance.com

To help us to deal with your comments quickly, please quote your policy or *claim* number and name of the *policyholder.*

We will do our best to resolve any difficulty directly with you, but if we are unable to do this to your satisfaction you may be entitled to refer the dispute to the Financial Ombudsman Service who will review your case and who may be contacted at:

Financial Ombudsman Service
South Quay Plaza
183 Marsh Wall
London
E14 9SR

Email: complaint.info@financial-ombudsman.org.uk, or telephone 0845 080 1800.

## Sanctions Endorsement

The *insurer* shall not be liable to make any payment under any insurance cover or extension with respect to any *claim* made against any *insured*:

1.    with whom or which the *insurer* is prohibited from transacting business;

2.    to whom or which the *insurer* is prohibited from providing insurance or offering economic benefits ; or

3. who or which is declared unable to receive an economic benefit

because of an embargo or other economic sanction imposed by law or regulation which governs this policy, the *insurer*, its parent company or its ultimate controlling entity.

All other terms, exclusions and conditions of this policy remain unaltered.

## Professional Indemnity Exclusion - with Carve back for Failure to Supervise

The *insurer* shall not be liable to make any payment under any insurance cover or extension or in connection with any *claim* arising out of, based upon or attributable to the *insured*'s performance of or failure to perform professional services, or any act, error, or omission relating thereto.

Provided however, that the foregoing exclusion shall not be applicable to any derivative or shareholder derivative action *claim* alleging a failure to supervise those who performed or failed to perform such professional services.

All other terms, exclusions and conditions of this policy remain unaltered

| | Territory | | % | Premium split | 100% Gross % Applicable to Tax Tax Applicable per Country | Premium CDC CORP D and O $ 170,000.00 Tax Applicable |
|---|---|---|---|---|---|---|
| CDC CORP D and O | | US$ | | US$ | | US$ |
| | Total | 320,412,562.00 | 100.0000% | 170,000.00 | | |
| Australia | | 33,393,375.00 | 10.4220% | 17,717.39 | -3.00% | 0.00 |
| India | | 1,434,269.00 | 0.4476% | 760.97 | 0.00% | 0.00 |
| Singapore | | 701,835.00 | 0.2190% | 372.37 | 0.00% | 0.00 |
| China | | 21,750,555.00 | 6.7883% | 11,540.10 | 0.00% | 0.00 |
| Hong Kong | | 796,362.00 | 0.2485% | 422.52 | 0.00% | 0.00 |
| Japan | | 6,930,808.00 | 2.1631% | 3,677.25 | 0.00% | 0.00 |
| Denmark | | 676,491.00 | 0.2111% | 358.92 | 0.00% | 0.00 |
| Finland | | 1,666,493.00 | 0.5201% | 884.18 | 23.00% | 203.36 |
| Germany | | 4,395,164.00 | 1.3717% | 2,331.92 | 19.00% | 443.07 |
| Sweden | | 19,591,860.00 | 6.1146% | 10,394.77 | 0.00% | 0.00 |
| Belgium | | 1,656,056.00 | 0.5169% | 878.65 | 9.25% | 81.27 |
| Ireland | | 3,144,945.00 | 0.9815% | 1,668.60 | 3.00% | 50.06 |
| Netherlands | | 4,009,564.00 | 1.2514% | 2,127.34 | 7.50% | 159.55 |
| UK | | 22,818,892.00 | 7.1217% | 12,106.93 | 5.00% | 605.35 |
| France | | 8,167,456.00 | 2.5490% | 4,333.37 | 9.00% | 390.00 |
| Spain | | 5,955,702.00 | 1.8588% | 3,159.89 | 6.15% | 194.33 |
| Canada (Ont) | | 39,163,944.00 | 12.2230% | 20,779.06 | -3.00% | -623.37 |
| | | | | | 8.00% | 1,662.32 |
| USA | | 119,275,007.00 | 37.2254% | 63,283.26 | 0.00% | 0.00 |
| Cayman Islands | | 360,989.00 | 0.1127% | 191.53 | 0.00% | 0.00 |
| British Virgin Islands | | 24,522,795.00 | 7.6535% | 13,010.96 | 0.00% | 0.00 |

3165.95

## CERTIFICATE OF SERVICE

I, William D. Matthews, certify that I am over the age of 18 and that on June 5, 2013, I served a copy of the foregoing Complaint by electronic mail as shown:

David S. Weidenbaum
James H. Morawetz
Office of the U.S. Trustee
362 Richard B. Russell Building
75 Spring Street, SW
Atlanta, GA 30303
david.s.weidenbaum@usdoj.gov
jim.h.morawetz@usdoj.gov

Joseph D. Stutz, General Counsel
CDC Corporation
2002 Summit Boulevard, Suite 700
Atlanta, GA 30319
JStutz@cdcsoftware.com

Marcus A. Watson, Chief Restructuring Officer
CDC Corporation
c/o Finley, Colmer and Company
5565 Glenridge Connector, Suite 300
Atlanta, GA  30342
marc@finleycolmer.net

Jeffrey W. Kelley
J. David Dantzler, Jr.
Troutman Sanders LLP
600 Peachtree Street, NE
Suite 5200
Atlanta, GA 30308-2216
jeffrey.kelley@troutmansanders.com
david.dantzler@troutmansanders.com

Amit Tyagi
Solicitor Advocate
CMS Cameron McKenna LLP
Mitre House
160 Aldersgate Street
London, EC1A 4DD, United Kingdom
amit.tyagi@cms-cmck.com

This 5th day of June, 2013.

_/s/ William D. Matthews_____
William D. Matthews
Georgia Bar No. 470865
WDM@lcsenlaw.com

3343 Peachtree Road NE, Suite 550
Atlanta, GA 30326
(404) 262-7373
 (404) 262-9911 (facsimile)

406624